MORROW-THOMAS HARDWARE COMPANY, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9566. Filed June 30, 1954.

*Arthur Glover, Esq.*, and *Walter G. Russell, Esq.*, for the petitioner.
*Allen T. Akin, Esq.*, for the respondent.

792

794

798

OPINION.

TURNER, *Judge:* By section 722 (a) of the Internal Revenue Code,[6] it is provided that if a taxpayer establishes that its excess profits tax, computed without the benefit of section 722, is excessive and discriminatory, and also establishes "what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the purposes of an excess profits tax based upon a comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined" under the statute. By section 722 (b) (2) of the Code,[6] it is provided that if the business of a taxpayer en-

[6] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(a) GENERAL RULE.—In any case in which the taxpayer establishes that the tax computed under this subchapter (without the benefit of this section) results in an excessive and discriminatory tax and establishes what would be a fair and just amount representing normal earnings to be used as a constructive average base period net income for the pur-

titled to use the excess profits credit based on income pursuant to section 713 was depressed in the base period because of temporary economic circumstances unusual to it, then its excess profits tax, computed without the benefit of section 722, "shall be considered to be excessive and discriminatory * * * if its average base period net income is an inadequate standard of normal earnings."

It is the claim of the petitioner that, by reason of prolonged drought and dust storms, unusual in its trade area, its business was depressed during the base period, and as a consequence, its average base period net income was an inadequate standard of normal earnings within the meaning of section 722 (b) (2). It further claims that its average net earnings for the period 1915 to 1933, inclusive, is a fair and just amount to be used as its constructive average base period net income for the purposes herein.

It is the position of the respondent that dust storms and drought are not unusual in petitioner's trade territory, that they did not therefore constitute temporary economic circumstances unusual in the case of petitioner, within the meaning of section 722 (b) (2), that the evidence does not show that petitioner's business was depressed in the base period, and that its average base period net income is a fair and proper standard of normal earnings.

We have heretofore held that where a prolonged drought and resulting crop failures adversely affected a taxpayer's base period earnings to such an extent that the average of such earnings was an inadequate standard of normal earnings, such taxpayer qualifies, under section 722 (b) (2), for such section 722 relief as may result from the determination of its excess profits tax by using the "constructive average base period net income" as established by the evidence, in lieu of the "average base period net income otherwise determined" under the

---

poses of an excess profits tax based upon comparison of normal earnings and earnings during an excess profits tax period, the tax shall be determined by using such constructive average base period net income in lieu of the average base period net income otherwise determined under this subchapter. In determining such constructive average base period net income, no regard shall be had to events or conditions affecting the taxpayer, the industry of which it is a member, or taxpayers generally occurring or existing after December 31, 1939, except that, in cases described in the last sentence of section 722 (b) (4) and in section 722 (c), regard shall be had to the change in the character of the business under section 722 (b) (4) or the nature of the taxpayer and the character of its business under section 722 (c) to the extent necessary to establish the normal earnings to be used as the constructive average base period net income.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713 if its average base period net income is an inadequate standard of normal earnings because—

\* \* \* \* \* \* \*

(2) the business of the taxpayer was depressed in the base period because of temporary economic circumstances unusual in the case of such taxpayer or because of the fact that an industry of which such taxpayer was a member was depressed by reason of temporary economic events unusual in the case of such industry,

statute. *S. N. Wolbach Sons, Inc.*, 22 T. C. 152. Cf. *A. B. Frank Co.*, 19 T. C. 174. That there was a prolonged drought, with resulting crop failures and dust storms, which were unusual in duration and effect in petitioner's trade territory, is definitely and clearly shown by the evidence, and we are thus brought to the question whether the petitioner's business in the base period was depressed thereby and to such an extent that its average net income for the base period years was an inadequate standard of normal earnings, for the purposes of section 722.

As demonstrating that its business was depressed because of the drought and dust storms and that its average base period net income was accordingly an inadequate standard of normal earnings, petitioner, on brief, sums up its argument as follows:

The drought and dust storms experienced in petitioner's trade territory during the years 1933 through 1939 curtailed agricultural production; the total annual cash farm income in said territory was seriously depressed; the income of petitioner was dependent upon agricultural production and income; the depression of agricultural production and income depressed petitioner's income, * * *

While we find no fault with the stated syllogism, as such, the question for decision is not, on the record here, readily or reasonably susceptible of such simplification or disposition. In the first place, the income of petitioner was only partially dependent upon agriculture, and we are not advised whether that dependency, dollar- or profit-wise, was major or minor. In the second place, the volume of business done by petitioner during the base period was higher than for any prior 4 consecutive years as far back as 1915, except the period 1926 to 1929, inclusive, and with respect to that period, it is to be noted that oil had been discovered in petitioner's trade territory in 1924, and 1926, for practical purposes, marked the beginning of oil and gas production on a substantial scale; and further, that in 1926 petitioner's retail sales jumped to $171,353.65, as compared with $83,178.25 for 1925 and $89,384.33 for 1927, which were petitioner's years of next highest retail sales volume.[7] And while it is true that the percentage of net profits to sales was noticeably less in the base period than for most, if not all, other consecutive 4-year periods, except those covering the depression years of 1930 to 1935, inclusive, the petitioner has not undertaken to point out or demonstrate that its sales prices were ratably lower or that the increased or possibly added cost items, whichever brought about lower net profits for the base period in spite of the higher volume of sales, were attributable to or the result of the drought and dust storms.

---

[7] This comparison of retail sales by years is based upon retail sales for the years 1924 and after, since there is no breakdown of record of total sales as between retail sales and wholesale sales for any year prior to 1924.

The petitioner has shown, however, that for crop reporting districts 1–N, 1–S, and 2, in which the counties comprising its Texas trade territory were located, the farm income during the base period, though it had recovered to some extent from the depression period, was still substantially lower than it had been in years preceding the depression, and there is also evidence which convinces us that the same was true of counties comprising the Oklahoma Panhandle and that part of petitioner's trade territory which was in northeastern New Mexico. The evidence further shows that in by far the greater portion of petitioner's trade territory the business activities were chiefly farming and ranching, and the retail stores, which were petitioner's customers in such area, drew their customers, directly or indirectly, from the farm and ranch trade; and as to the much smaller geographical area, in which oil and gas was produced, and in the 2 counties in which the 2 largest cities of the area, Amarillo and Lubbock, are located, the respondent has acceded to petitioner's requested finding that 50 per cent or more of the customers of the retail stores, which in turn were petitioner's customers, were similarly attributable to farming and ranching operations.

In addition to the above, the facts further show that following successive crop failures, resulting from the prolonged drought in the middle 1930's, a very substantial portion of petitioner's trade territory, along with southeastern Colorado and southwestern Kansas, was subjected to dust storms of such intensity and frequency as to become known as the Dust Bowl. And due in part to the actual land damage resulting from wind erosion and in part to fright and financial disaster, substantial acreage of the land under cultivation was abandoned, the acreage abandoned varying from a high of 30 per cent in some counties, to a fraction of 1 per cent in others, approximately 40 per cent of the abandonments being because of actual land damage and approximately 60 per cent to fright or other causes. It was the view of one witness, who had a major part in the Federal soil conservation program, that there was possibly some damage to 10 per cent of the land in the counties affected.

Having examined and considered the evidence, we are convinced by the over-all picture shown that because of the prolonged drought of the 1930's and the resulting crop failures and dust storms petitioner was unable to make some sales during the base period which it would have made, absent the drought and the consequences thereof; that by reason of its failure and inability to make those sales, its business and earnings during the base period were depressed; and to the extent that its base period earnings were so depressed, they were an inadequate standard of earnings within the meaning of section 722 (b) (2), *supra.*

As to the amount by which petitioner's base period earnings were depressed because of the drought and the consequences thereof and what would be a fair and just amount representing normal earnings to be used as its constructive average base period net income, the evidence is most indefinite and the conclusion of amount which may be drawn therefrom is largely conjecture. In its applications for relief, petitioner seemingly accepted its average base period sales of $733,275 as normal for the period, applying thereto its experienced 1915–1929 net profits factor of 10.8818 per cent to arrive at a claimed constructive average base period net income of $79,926.97. In the instant proceeding, the petitioner has abandoned that approach and the use of its 1915–1929 experienced net profits to sales ratio, and now claims that its average net profits for the 1915–1933 period of $49,993, or $50,000, "in round figures," represents the proper amount to be used as its constructive average base period net income. It makes no suggestion or claim whatever as to what would have been a normal volume of business for the base period, absent the drought and its consequences, or what a normal net profits to sales ratio would have been on normal sales for the period. In fact, beyond the claim itself, with the attendant explanation that the 1915–1933 period included 9 depression and 10 prosperity years, petitioner has not indicated how the realization of a net profit of $49,993, or 9.12 per cent, on average annual sales of $548,130 for the 1915–1933 period is to be translated into or established as normal average net profits for a period in which it claims its business was depressed because of the reduced buying power of the farmers of its trade territory, but in which, in spite of such depressed business, its actual average annual sales were $733,275, or approximately one-third again as large as its average 1915–1933 sales of $548,130.

The volume of the base period business being up, not down, it is thus apparent that the key to the comparably lower base period net profits is to be found in the substantially reduced base period net profits to sales ratio. For the 1915–1933 period, which petitioner now seeks to have us accept as indicative of normal for the base period, the ratio of net profits to average annual sales of $548,130 was 9.12 per cent, as contrasted with a ratio of 5.26 per cent on actual average sales of $733,275 for the base period. A glance at the figures reflecting petitioner's sales and profits experience for 1915 through the base period readily discloses that the lower ratable profits for the base period were the result of two things, a lower margin of gross profits to sales and an over-all increase in expenses. As compared with the 1915–1933 period, the margin of gross profits to sales was 18.99 per cent for the base period, as against 21.88 per cent for the earlier period, while the average of expenses incurred in realizing the average base period net profits of $39,147.48 was $113,440, or 137

per cent of the average 1915–1933 expenses of $82,905 incurred in earning average net profits of $49,993. These two items, the increased expenses and the reduced margin of gross profits to sales, account for several times more than the margin of $10,852.52 between the $50,000, "in round figures," claimed by petitioner as the fair and just amount to be used as its constructive average base period net income and its actual average base period net income of $39,147.48. It does not follow, however, that the items in question were abnormal for the base period, or would have been ratably different on a normal volume of business, absent the drought and dust storms. There is no showing, or claim, for that matter, that the drought and its consequences had any influence on the cost of the goods sold by petitioner in the base period; and to the extent the reduced margin of gross profits on sales resulted from an increase in the cost of goods sold, there is no basis for saying that such margin of profit was not normal. It could have been possible that the narrow margin resulted to some extent from bargain or reduced prices offered by petitioner to the farmers of the area, but, if so, there is no claim or proof to that effect.

Similarly, the ratable increase in petitioner's expenses for the base period could, to some degree, have been attributed to a costly operation, due to the drought. The ratable cost of making the sales, for instance, could have been higher, but, as in the case of the lower margin of gross profits to sales, there is no proof or claim that such was the case. Furthermore, by their nature, one or more of the other categories of expenditures would not in any event readily lend themselves to a claim that they were higher in the base period as a consequence of the drought. An illustration is officers' salaries. A reduction therein might well have been more logical, if they had been affected by the drought. Another item of expense contributing, to some noticeable extent, to the ratably lower base period gross profits was the seldom recurring item of catalogue expense. It likewise has not been attributed to the drought by claim or proof. As to various other items of expense, some were slightly higher, on the average, for the base period than for prior years or periods, some were slightly lower, while others continued at substantially the same levels. As to such other items, however, we have made detailed findings, according to the evidence of record, for all the years 1915 to 1939, inclusive, and the facts with respect thereto tell their own story, making further review at this point unnecessary.

One of the items making up the category "other income," namely, income from the farm implement dealing partnership, although shown to have been erratic over the years, was, on the average, relatively lower for the base period than for years prior to the depression, and might well have been depressed because of the conse-

quences of the drought. The average of such income was relatively small over the years, however, and taking the category of "other income" as a whole, the average thereof for the base period was substantially the same as for the 1915–1933 period and other suggested periods.

We are thus brought to the conclusion that the evidence of record does not indicate or justify as normal for the base period a greater net profits to sales ratio than that of 5.26 per cent actually experienced by petitioner. We have heretofore concluded, however, that because of the prolonged drought and the resulting crop failures and dust storms petitioner was unable to make some sales during the base period which it would otherwise have made and, by reason of its inability to make those sales, its business and earnings during the base period were depressed to the extent of the profits which would have been realized on such additional sales. It is our further conclusion that petitioner's actual average base period net income, increased by the profits which it would have realized on such additional sales, constitutes the fair and just amount to be used as its constructive average base period net income, for the purposes herein.

As to the amount by which petitioner's sales for the base period would have been so increased, absent the drought, there is very little evidence on which to base a definitive determination. We do know that in some parts of petitioner's trade territory, particularly the marginal areas, there was considerable abandonment of the land then in cultivation, while in other areas abandonment was negligible. We also know that, to some degree, the abandonment was temporary and the quality of the land abandoned was such that it would in reason be returned to cultivation; whereas other portions of the land abandoned were marginal, and as to such land, it was the cultivation, not the abandonment, which was temporary. And while it is true that the population of the cities and towns of the area appears to have been increased to about the same extent that the population of the rural areas decreased, to the end that the outlets for petitioner's goods among the people involved were not wholly lost, it does stand to reason that to some extent the abandonments meant a complete loss of customers to petitioner and petitioner did lose some net profits on the sales of merchandise of which it was thereby deprived. There was also some loss of sales, we think, to farmers who did not abandon their holdings but continued on the land. It is not possible, on the proof, however, to conclude that the sales so lost were nearly as substantial as petitioner would have us do. In the first place, by a comparison of petitioner's base period business with that for all of the prior years it had been in operation, there was no loss of sales, since its sales in the base period were actually higher than in any 4 consecu-

tive year periods, save one, and in one of the years of that period retail sales were abnormally high. It is also reasonable to conclude that the loss of purchasing power by the farmers, which in turn would have had a depressing effect on petitioner's sales, was offset to a very substantial extent through Federal loans and subsidies to farmers of the area. The Government was providing direct financial assistance to enable the farmers of the area to maintain their operations, and the maintenance of those operations, even though by loans and subsidies, would tend to keep petitioner's business that much closer to the normal level. The extent to which sales were lost and to which potentially lost sales were offset in the manner indicated, there is no way of knowing. Some indication might have been given by showing, dollar-wise, whether petitioner's sales during the base period in the counties in which agriculture was predominant indicated a downward fluctuation, as compared with its sales in those counties for other years. Such a possibility of proof was suggested at the trial and the respondent consented to cooperate in submitting by stipulation, following the trial herein, such data with respect thereto as might be shown by petitioner's books, but no such data has been submitted.

The record being as it is, and following the principle of *Cohan* v. *Commissioner*, 39 F. 2d 540, we have concluded and found that absent the drought and its consequences, petitioner's average base period sales would have been greater by $25,000 than they were and on such added sales it would have realized average base period net profits of $1,315, and further, that a fair and just amount to be used as petitioner's constructive average base period net income is $40,462.48. See and compare *National Grinding Wheel Co.*, 8 T. C. 1278.

Reviewed by the Special Division.

*Decision will be entered under Rule 50.*